# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. JERRY ELLIOT

**Appeal from the Circuit Court for Henderson County**
**No. 10-067-2     Donald H. Allen, Judge**

**No. W2011-00894-CCA-R3-CD  - Filed July 20, 2012**

The Defendant, Jerry Elliot, was found guilty by a Henderson County Circuit Court jury of aggravated assault, a Class C felony. See T.C.A. § 39-13-102 (2010).  He was sentenced as a Range II, multiple offender to ten years' confinement.  On appeal, he contends that the evidence is insufficient to support his conviction.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Hewitt Chatman, Jackson, Tennessee, for the appellant, Jerry Elliot.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Angela R. Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to an altercation between the Defendant and the victim involving a property line dispute.  The victim testified that he and the Defendant had been neighbors for four or five years and never argued about the property line until January 24, 2010.  He said that on the morning of January 24, he saw James Coleman walking along his property looking for the Defendant's property line.  He showed Mr. Coleman the property line marker along the fence line.

The victim testified that the Defendant did not answer his telephone calls and that he walked to the Defendant's home to find out why the Defendant questioned the property line. He said that on his way to the Defendant's home, the Defendant yelled that he was

trespassing and that the Defendant would shoot if he took another step. The victim asked the Defendant if there was a problem with the property line, and the Defendant said, "You're a f'ing liar, a thief." He said the Defendant pointed a gun at him and said, "I'll pop you where you stand." As the victim turned to leave, the Defendant told him to get his tractor and boat off the Defendant's property. He said the tractor and boat were close to his home. He said that he decided to let the police handle the matter and that he walked away and went home.

The victim testified that the Defendant's gun was long and that he was forty to fifty yards from the Defendant when it was pointed at him. He said he feared for his life and thought the Defendant was out of control and capable of anything. He stated that he had no further contact with the Defendant but that he was harassed. He said that fires were set to his property and that he feared the Defendant would shoot his dog. He sold his property to get away from the Defendant.

On cross-examination, the victim testified that the fence was built in 2003, that his property was surveyed sometime after 2003, and that Mr. Coleman worked for the survey company. He thought Mr. Coleman was very friendly and said Mr. Coleman told him the Defendant wanted to build a lake on the Defendant's property. He said that Mr. Coleman was near the tractor shed beside his home when he saw him and that the Defendant was on the Defendant's sister's property. The Defendant did not enter the victim's property.

The victim testified that he was 120 to 150 feet from the Defendant when he saw the Defendant holding a gun. He said it was possible the Defendant carved a stick to make it look like a gun but said he was a hunter and familiar with weapons. He said he was convinced the Defendant held a gun and was willing to use it. He said he called the Sheriff's Office. He said Sergeant Jackson spoke to him, walked to the backyard, and saw the Defendant and another person on the Defendant's property.

Henderson County Sheriff's Sergeant Johnny Jackson testified that he responded to a call at the victim's home on January 24, 2010, and that he spoke with the victim at his home. He drove to the Defendant's home, heard music from the back of the home, and announced his presence. He said he saw the Defendant and Mr. Coleman. He said that he asked the Defendant if he pulled a gun on the victim and that the Defendant said, "It didn't matter what happened because he was on his own property." He said the Defendant said later that he just had a stick. The Defendant did not show Sergeant Jackson the stick.

Sergeant Jackson testified that he asked for the Defendant's permission to go into his home and that the Defendant consented. He said that after he and another deputy went into the Defendant's home and began looking around, a female appeared and asked what was happening. Sergeant Jackson stated that he explained his presence and that the Defendant

said he did not want them looking around any longer. He and the deputy arrested the Defendant based on the victim's statement.

On cross-examination, Sergeant Jackson testified that one, possibly two, additional officers came to the victim's home. He said that he knew Deputy Steven Little came to the Defendant's home and that if a third deputy was there, it was Alan Nowell. He said he was the only officer who questioned the Defendant about the incident. He said the Defendant and Mr. Coleman had nothing in their hands when he arrived at the Defendant's home. He could not recall if the female left the home while he was there.

Sergeant Jackson testified that he entered the Defendant's home through the living room and went into the kitchen. He said that as he and Deputy Little walked through the home, the Defendant talked about needing to take his medication and went into the kitchen. He and Deputy Little followed the Defendant into the kitchen. He said that as Deputy Little began looking in cabinets, the Defendant stated, "I really don't want [you] looking." He said he did not find any weapons and did not recall anyone opening a closet or dresser. He said the Defendant was not left unattended during the search. He did not witness the exchange between the Defendant and the victim.

On redirect examination, Sergeant Jackson testified that he based his decision to arrest the Defendant on the victim's and the Defendant's statements. He said the Defendant gave vague answers and did not answer his questions directly. He said that although the Defendant said he pointed a stick at the victim, the Defendant refused to show him the stick. He said Deputy Little's search lasted no longer than three minutes and was limited to the kitchen. On further cross-examination, Sergeant Jackson testified that the Defendant never told him that he had a weapon.

James Coleman testified for the defense that on January 24, 2010, the Defendant drove him to the Defendant's home to do some work around his home. He said that they arrived at the Defendant's home around 8:00 or 9:00 a.m. and that they worked outside "scrapping and burning aluminum and wire."

Mr. Coleman testified that his older brother Eddie Coleman owned a surveying company and that his brother surveyed the victim's property. He said that on the morning he and the Defendant were scrapping and burning metal, the Defendant asked him to find the boundary lines, pins, and markings from the survey. He said he walked the "flagged lines" and found some of the pins. He said the victim approached him and asked what he was doing and why he was on the victim's land. He said he told the victim that he used to work for Coleman & Associates Land Surveyors and that he was trying to find the markings and pins. He said the victim showed him most of the markings around the property. He said that the

Defendant stood in his yard while he and the victim stood in a field that separated the Defendant's and the victim's properties and talked about the various property lines. He said he found all his brother's markings and additional markings that his brother did not find. He showed the Defendant what he found.

Mr. Coleman testified that the Defendant returned to his home after he showed the Defendant the markings and that the victim came outside again, walked across the field, took his shirt off, and tried to "act macho or bad. . . ." He said the Defendant stood at the end of his yard and told the victim, "You already . . . took my brother's land by surveyor." He said that the victim and the Defendant yelled at each other a few minutes and that the Defendant walked away. He said Sergeant Jackson arrived at the victim's home a few minutes later.

Mr. Coleman testified that the Defendant only had a rake in his hand when he spoke to the victim. He held a shovel and said they used the rake and shovel to "work the fire." He said that he saw the entire exchange between the Defendant and the victim and that he never saw a weapon. He said the Defendant did not go into his home to get a weapon. He said that he and the Defendant went into the Defendant's home through the back door to get coffee and warm up occasionally because it was cold outside. He said they did not use the front door that morning because the Defendant's girlfriend, Debbie, did not want them tracking dirt into the home.

Mr. Coleman testified that the Defendant kept a broken muzzleloader in the living room but that the Defendant did not take the gun outside that morning. He said that two deputies came to the Defendant's home, that Sergeant Jackson spoke to the Defendant outside, and that the other deputy went into the home. He said the Defendant told his girlfriend to go inside and get his medication. He said the Defendant's girlfriend was inside the home with the deputy and he, the Defendant, and Sergeant Jackson stood outside. He said he did not see or hear the Defendant threaten the victim at any time.

On cross-examination, Mr. Coleman testified that he did not perform the survey of the victim's property, that he did not work for his brother when the survey was performed, and that he had not worked for his brother for three or four years. He agreed that the weather was cold on January 24, 2010, even though the victim took off his shirt. He agreed that the police report showed Sergeant Jackson responded to the victim's call at 9:00 a.m. He agreed he walked the property line with the victim, saw the Defendant and the victim argue over the property lines, and started burning the metal within one hour. He admitted he was convicted of four counts of shoplifting, five counts of theft, and vehicle burglary. On redirect examination, Mr. Coleman testified that he had difficulty with the police in the past but that he was telling the truth about what he saw on January 24.

Debra Powers testified for the defense that she had known the Defendant for forty years and that they had dated over the years. She said that she spent the night at the Defendant's home on January 23, 2010, and that Mr. Coleman was at the Defendant's home when she woke at 7:30 the next morning. She stated that she started cooking breakfast not long after she woke and that the Defendant and Mr. Coleman cleaned up brush piles in the backyard while she cooked. She said they came inside through the back door twice to get coffee. She said that after breakfast, they went back to work.

Ms. Powers testified that she could see the living room from the kitchen and that there was a muzzleloader near the television in the living room. She denied seeing the victim that morning and said two deputies came to the Defendant's home. She said she went outside when she saw the two police cars. She stated that a deputy asked if they could search the Defendant's home and that the Defendant consented. She said one of the deputies went into the home with her. She said that they entered the living room, that the deputy asked to see the muzzleloader, and that she showed him the gun. She did not know if the gun worked but knew there was no ammunition in the home. She stated that the deputy asked for permission to look around the rest of the home and that they went into the bedroom. The deputy looked inside the closet and the chest and found a "partially disassembled shotgun" in the closet and a "disassembled shotgun" in the chest. She said that the Defendant worked on guns for his friends and that the guns were not finished. She said the deputy stated, "It doesn't look like all of the parts are here."

Ms. Powers testified that although the Defendant came into the kitchen that morning for coffee and breakfast, he did not retrieve a weapon. She said that in order for the Defendant to have grabbed the gun from the living room, he would have had to go through the kitchen. She said the Defendant and Mr. Coleman used the back door that morning because of the soot on their feet from working outside. She said she did not allow them to be in the living room.

On cross-examination, Ms. Powers testified that Mr. Coleman may not have known she was asleep inside the home when he and the Defendant arrived that morning. She did not know if the Defendant was inside the home before she woke. She said the Defendant and Mr. Coleman came through the back door to get coffee two or three times while she cooked breakfast. She said that the Defendant and Mr. Coleman came inside once together and that both men came inside once alone. She said it took about thirty to forty-five minutes to cook breakfast.

The defense recalled Sergeant Jackson, who testified that he was not sure if a third officer responded to the Defendant's home on January 24, 2010. He denied that the deputy went into the Defendant's home alone and stated that he, the deputy, and the Defendant went

into the home together.  He did not know if the deputy looked in the bedroom closet and chest.

On cross-examination, Sergeant Jackson testified that he arrived at the victim's home at 9:00 a.m. and that he spoke to the victim for about fifteen to thirty minutes.  He denied seeing a rake and a shovel outside the Defendant's home.  He said the Defendant and Mr. Coleman had nothing in their hands when he approached them and denied seeing smoke outside.  He denied seeing a gun near the television in the living room and said no one told him a muzzleloader was in the living room.  He said he did not see a partially disassembled gun in the home.  He said he would have taken the muzzleloader as evidence if he had seen the gun.  He said Deputy Little did not leave his sight for a long period of time.

The defense recalled Ms. Powers, who testified that Sergeant Jackson never went inside the Defendant's home on January 24, 2010.  She said that she was inside the home and that the deputy was the only officer who came inside.  She said the Defendant was outside in handcuffs with Sergeant Jackson before the home was searched.  She said Mr. Coleman came into the living room and asked where he could find the Defendant's medication while she and the deputy were in the bedroom.

Ms. Powers testified that the deputy asked to see the muzzleloader, that she showed him where the gun was, and that the deputy looked around the television.  She said that the deputy looked in the kitchen and that he went to the Defendant's bedroom again and looked in the closet, chest and dresser, underneath the mattress and the bed, and in the bathroom.  She said no one else was in the home.  On cross-examination, Ms. Powers testified that the front door of the Defendant's home opened into the living room, that the kitchen was on the left, and that the bathroom and back bedroom were on the right.  She could not explain how Sergeant Jackson knew the layout of the Defendant's home.

The Defendant testified that on January 24, 2010, Mr. Coleman helped clean around the outside of his home and that he had Mr. Coleman walk the property line because he wanted to build a fence.  He said Mr. Coleman walked his property and placed a sign at the corner designating the Defendant's property line.  He said that Mr. Coleman walked to the other end of the field and that the victim confronted Mr. Coleman.

The Defendant testified that when the victim confronted the Defendant, he was in his backyard, approximately forty to fifty yards from the sign.  He said the victim walked to the sign and stopped.  He denied having a weapon in his hands but said he may have had a rake or a stick.  He said he hurt his back and walked with a stick at the time.  On cross-examination, the Defendant testified that Mr. Coleman stayed overnight on January 23, 2010, and that Mr. Coleman was confused about the Defendant's picking him up early on January

24. He denied pointing a weapon at the victim and said the brush fire was below his home and burning before January 24.

Upon this evidence, the jury found the Defendant guilty of aggravated assault. The trial court sentenced the Defendant to ten years in the Department of Correction. This appeal followed.

## I

The Defendant contends that the evidence is insufficient to support his conviction because the evidence did not establish that he had a gun in his possession or made threats that would have placed the victim in fear for his life. The State contends that the evidence is sufficient and argues that the jury accredited the victim's testimony. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A person commits aggravated assault, in relevant part, when he intentionally or knowingly causes another to reasonably fear imminent bodily injury and uses or displays a deadly weapon. See T.C.A. §§ 39-13-101(a)(2), 39-13-102(a)(1)(B) (2010). In the light most favorable to the State, the victim testified that as he walked toward the Defendant's property, the Defendant yelled that the victim was trespassing and that he would shoot if the victim took another step. The Defendant called the victim a liar and a thief, pointed a gun at the victim, and said, "I'll pop you where you stand." Although the victim was forty to fifty yards from the Defendant, he said the gun was long. The victim was a hunter and familiar with weapons. The victim was convinced the Defendant had a gun and was willing to use it. The victim said he feared for life and thought the Defendant was out of control and capable of anything.

The jury's verdict reflects that it rejected the Defendant's claim that he did not threaten the victim with a gun. Although the Defendant denied pointing a gun at the victim, when first questioned by Sergeant Jackson, the Defendant stated that regardless of what happened, the Defendant was on his property. The Defendant later claimed to have pointed

a stick at the victim but refused to show the stick to the police. The police did not find a stick, rake, or shovel on the Defendant's property. Although there were varying accounts of who was in the Defendant's home during the search and whether a gun was found, any conflicts in the testimony are presumed to have been resolved by the jury. See Sheffield, 676 S.W.2d at 547. Ms. Powers was the Defendant's girlfriend and Mr. Coleman had a lengthy criminal history for theft. Any questions about the credibility of the witnesses were resolved by the jury. We conclude that a rational trier of fact could have found the elements of aggravated assault beyond a reasonable doubt and that the evidence is sufficient to support the Defendant's conviction.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE